UNITED STATES of America, Appellee,

v.

Bartholomew BUIGUES, Angelo Puig, Irma Anes, Susan Horowitz and John Sammarco, Appellants.

Nos. 181 to 302 and 343, Dockets 77-1249, 77-1252, 77-1253, 77-1374 and 77-1386.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1977.

Decided Jan. 6, 1978.

Jeremy G. Epstein, Asst. U. S. Atty. for the Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Robert J. Jossen, Asst. U. S. Atty., New York City, of counsel), for appellee.

Ernest H. Hammer, New York City, for appellant Buigues.

Daniel J. Sullivan, New York City, for appellant Puig.

Joseph I. Stone, New York City, for appellant Anes.

Richard E. Rieder, New York City (Dunnington, Bartholow & Miller, New York City, of counsel), for appellant Horowitz.

W. Paul Flynn, New Haven, Conn., for appellant Sammarco.

Before MOORE, FEINBERG and MULLIGAN, Circuit Judges.

MOORE, Circuit Judge:

Appellants Bartholomew Buigues, Angelo Puig, Irma Anes, John Sammarco, and Susan Horowitz appeal from judgments of conviction entered on January 17, 1977. All

were convicted by a jury verdict of conspiracy, Count One, to defraud the United States in violation of 18 U.S.C. § 371, and Counts Two and Three, of filing false claims against the United States in violation of 18 U.S.C. § 287 and § 2 (aiding and abetting).

Buigues received a sentence of two years' imprisonment with the condition that he spend three months in a jail-type institution; the balance of the sentence was suspended, and Buigues was placed on probation for two years following his term of imprisonment. Puig was sentenced to two years' imprisonment with the condition that he spend two months in a jail-type institution; the balance of the sentence was suspended, and Puig was placed on probation for two years following the term of imprisonment. Anes was placed on probation for one year and fined $1,500. Sammarco received a sentence of two months' imprisonment. Horowitz was placed on probation for one year and fined $1,000. Execution of the sentences of Buigues, Anes, Sammarco, and Horowitz have been stayed pending appeal. Puig has already served his term of imprisonment and is now on probation.

## THE INDICTMENT

Because the facts pertaining to each defendant differ, particular attention must be given to the specific charges against each. Count One charges, in substance, a conspiracy to defraud the United States by the submission of false claims. 18 U.S.C. § 287. More specifically and as an object of the conspiracy, defendants are charged with agreeing to defraud the United States Department of Agriculture ("USDA"), by causing it to reimburse a non-profit corporation, Youth in Government ("YIG"), by which they were employed, for work "supposedly performed" whereas "said employees performed little or no work and were not entitled to the salaries paid them" and that defendants presented claims "knowing such claims to be false, fictitious, and fraudulent." Counts Two and Three are for violation of 18 U.S.C. § 287 and § 2

(substantive counts plus aiding and abetting).

## THE OPENING, SUMMATION AND CHARGE

In the Government's opening, the prosecutor said that the case was "very simple": it was "about what are colloquially termed 'no show jobs'." (A. 7). In summation, the prosecutor inferred that defendants Horowitz and Sammarco were given "sham jobs and they had nothing to do". (A. 1105). In the charge, the Court said "Alleged unearned salaries are the keys to the contention involved herein". (A. 1206).

Against this backdrop the stage is set for presentation of a rather interesting scenario and an analysis of the parts each actor played therein. Insufficiency of the evidence necessary to convict advanced by defendants as their primary contention.

## THE FACTS

The Congress, to benefit poor children during the summer when the regular school lunch program was not in effect, authorized the USDA to administer a Special Summer Food Service Program for Children ("Summer Lunch Program"). 42 U.S.C. § 1761. In New York City, non-profit corporations ("sponsors") were to distribute lunches at various feeding sites, to be obtained by the sponsors. The sponsors, in turn, were to obtain lunches from food vendors selected by a bidding process. The sponsors were to be paid for their cost of the lunches (maximum 75¼ cents per lunch), and a maximum of six cents per lunch for administrative costs.

Buigues was Chairman of the Board of YIG. Early in 1975 Buigues, together with Puig, conceived the idea of using YIG as a sponsor. At that time, YIG was inactive; it sponsored no activities and had no money. During the winter and spring of 1975 Buigues and Puig, Executive Director of YIG, enlisted the aid of friends Gary Gilchrist, Frank Rodriguez, Pedro Rodriguez, and Ed-

ward Rogers.[1] They worked on a volunteer basis part-time during this period (January to June, 1975) to help set up the program, which consisted of endeavoring to find sites such as churches, schools, day care centers and facilities of community organizations that were appropriate for serving luncheons to the children. Collectively, they secured some 63 sites, which on submission by YIG to USDA for approval, were reduced to 43.

As a makeshift office, YIG acquired a storefront at 2176 Amsterdam Avenue in Manhattan. [Parenthetically, at this point it would appear that the function and duties of the sponsor would be: (1) to oversee the quality of the luncheons at the source (*i. e.*, the food vendor) and their shipment to their destination, the feeding sites; (2) to ensure the arrival of the luncheons at the feeding sites and their proper distribution to the children, together with prevention of misuse, namely, for example, sale to others, consumption by adults, etc.; and (3) to obtain and to maintain proper records evidencing these procedures.]

On June 27, 1975, the week before the program was to begin, Puig introduced Sammarco and Horowitz to the four employees-to-be and told them that Sammarco and Horowitz would be supervisors in the program. Earlier both Pedro and Frank Rodriguez thought they would become supervisors at a higher rate of pay. At the meeting, Puig advised the future employees that salaries for their positions would be only $110 per week, instead of $150 per week, because of the reduction in sites and a cut-back in funding.

The program was for the months of July and August.

Sammarco's primary duty was to work with the USDA to determine if complaints existed and then to have them corrected. Anes acted as bookkeeper. Horowitz's duty was to visit the food vendor in the Bronx and supervise the loading of the food and make sure that the food that left the vendor's facility on time, was wholesome and properly packaged.

YIG was paid approximately $142,000 for its services during July and August of 1975. After payment, an audit was conducted where documents were examined including YIG's payroll book and cancelled checks. The auditor allowed in full the amounts paid to the employees, including $1600 paid to Anes and $880 paid each to Sammarco and Horowitz. Anes made the entries in the payroll book in which it was recorded that every employee worked seven hours per day, five days per week, for each of the eight weeks of the program. Both Rogers and Pedro Rodriguez were paid only four weeks' wages because of a dispute with Buigues. Upon complaining to Buigues concerning their pay, Buigues threatened them. Also, Rogers encountered Puig and others on the street shortly before the indictment was filed. At that time Rogers was threatened with bodily harm if he acted as a witness.

Because of the claims that unjust convictions have been obtained, the court has examined with meticulous care the entire 1262 pages of transcript of the trial and has reviewed it with respect to each individual defendant.

*Buigues*

■ On appeal, counsel for Buigues submitted an *Anders*[2] brief in which he states that he has reviewed the 1262 pages of transcript and represents that "there exists [sic] no points upon appeal worthy of perfection for argument" in Buigues' behalf. Subsequently, Buigues submitted a brief *pro se* in which he claims that he, being a member of a so-called minority race, was a victim of selective prosecution and that (by adoption of the points of other appellants) the evidence was not sufficient to convict him. Because of Buigues' *pro se* brief, we have made an independent review of the evidence. We find no merit in his contention of selective prosecution and lack of evidence. Although employees of YIG were indicted for alleged violations of law

---

1. These volunteers were largely university students anxious to find summer jobs.

2. *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

in connection with the summer lunch program, no evidence was presented that indicated that the Government was prosecuting the case because of the minority status of the people in command. Furthermore, the issue was not raised in the trial below, and Buigues has waived this defense.

■ As to lack of evidence, there was ample evidence from which the jury could find and infer Buigues' conspiratorial involvement. He was Chairman of the Board of YIG, and involved in the selection of personnel. He helped set up the program, attended meetings, and visited the office several times during the summer. Anes, keeper of the payroll records, was the "girlfriend" of Buigues, and it was she who knowingly made the false entries in the payroll book of seven hours a day, for five days a week work for each employee. Buigues must have known or it could be reasonably inferred that he knew its contents. The evidence against Buigues was sufficient to convict him.

*Puig*

■ Puig argues that the Government failed to establish either conspiratorial intent or specific intent to make out a false claim. Puig was director of the program. The record indicates that at least some of the employees did not report regularly to work. In spite of this fact, Puig signed all payroll checks and reviewed all claims for reimbursement sent to the USDA.

Also, evidence of Puig's guilty knowledge can be obtained from statements given to the Assistant United States Attorney on March 9, 1976, which he repudiated at trial. In addition, the evidence that Puig threatened Rogers may be used to show consciousness of guilt. *U. S. v. Alberti*, 470 F.2d 878, 882 (2d Cir. 1972), *cert. denied*, 411 U.S. 919, 93 S.Ct. 1557, 36 L.Ed.2d 311 (1973).

*Anes*

■ Anes contends that she was denied a fair trial because the same attorney represented Buigues and herself, which resulted in an attorney-client multi-defendant conflict. In order to show denial of effective assistance of counsel, "some real conflict of interest, resulting from a joint representation must be shown to exist . . ." *United States v. Carrigan*, 543 F.2d 1053, 1055 (2d Cir. 1976). In this Circuit a defendant can waive the right of separate representation. *United States v. Mari*, 526 F.2d 117, 119 (2d Cir. 1975), *cert. denied*, 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976). In *Carrigan*, the court determined that the proper course of action was for the judge to conduct "a hearing to determine whether a conflict exists to the degree that a defendant may be prevented from receiving advice and assistance sufficient to afford him the quality of representation guaranteed by the Sixth Amendment." 543 F.2d at 1055. Judge Pollack held the appropriate hearing on the conflict issue on November 24, 1976 addressed to the issues itemized in *Carrigan*. At the hearing, Anes waived her right to separate representation. We have been shown no evidence that her original decision to waive her right to separate representation was improperly influenced. Anes, however, claims that the subsequent introduction of testimony concerning her codefendants' threatening of a Government witness somehow vitiates her waiver. Beyond the coincidental fact that the codefendants involved happened to be represented by her counsel, Anes has not demonstrated that this circumstance prejudicially affected the quality or strategy of her representation. In the absence of such proof, we find Anes' Sixth Amendment claim to be without merit.

■ Anes admitted knowing that the recording of seven hours a day for each employee was "inaccurate". These entries were to be basic to YIG's claim for reimbursement. Her acts came within the proscription of the statute.

Furthermore Anes had a full time job as an administrative assistant at Querer, Inc., an agency that assisted ex-convicts.

*Sammarco*

■ Sammarco argued that the evidence against him was insufficient. Sammarco

loaned $1,000 to Buigues via a man named Frank Cedo to help initiate the program. This money was never repaid. The jury could properly infer that repayment was to have come from summer salary earnings in a job which Sammarco never fully performed. Sammarco supposedly acted as Government liaison but a USDA official who testified could not identify Sammarco, although the witness could identify and remembered working with several other people on the YIG staff. In an interview with the FBI on August 4, 1976, Sammarco conceded that he had been absent from work often during the summer, and that he reported to work because of the $1,000 he had given Buigues. The Government witnesses testified that they saw Sammarco only on a few occasions during the summer, and not at all during the month of August. If Sammarco was acting as liaison with the Government, his duties would have included visits to the office. The jury could have reasonably concluded that he failed to perform his job, and as a result was involved in an attempt to defraud the Government.

Counsel for Sammarco has submitted to us a brief tantamount to an *Anders* brief wherein he addressed himself to whether there existed a bona fide basis for appeal on Counts One, Two and Three. He concluded that there is no such basis as to any of the Counts and represents to us that after extensive discussions with his client "[i]t has been bluntly explained that there does not exist a bona fide basis to argue for reversible error". Thereafter, Sammarco submitted to this court a *pro se* brief (which we accept and have considered) in which he takes issue with the Government's claims with respect to the $1,000 loan, the circumstances of his hiring by Buigues and his not working for 10 days. He also asserts that he never filed or caused to be filed any reimbursement vouchers. However, there was sufficient evidence that Sammarco was tied into the YIG scheme improperly to obtain funds from the Government.

*Horowitz*

Susan Horowitz was employed by YIG in June 1975 on Buigues' recommendation. Her duties consisted of being "at the vendor's to report increases, decreases, to make sure the lunches got out to the sites and to make sure the vendor was performing its job" (Puig, Tr. 850). She was to arrange for the number of lunches and that they be properly packed and delivered to the feeding sites on time. (Anes, Tr. 724–6). These duties required her presence at the vendors from 5:30 A.M.–6:00 A.M. to approximately 8:30 A.M.–9:00 A.M. (Puig, Tr. 874).[3] Her presence at the vendor's was noted by an employee of the vendor who said that he "used to see her just about every morning because of all the people, I think she was the one with the most complaints" and "[s]he wanted her trucks out first every morning. . . ." (Massielli, Tr. 637). For this work she received $110 a week. From July 7, 1975 on, Miss Horowitz also had a position with Arawak Consulting Corporation to do "[a] research project into the problem of reassimilating ex-offenders back into society". (Konstandt, Tr. 460). There was no time clock punch-in system at Arawak for its professional staff. She was not a "9 to 5, everyday employee". (Konstandt, Tr. 484).

There was no proof from which it could have been reasonably inferred that Miss Horowitz participated in the formation of the summer lunch program, that she submitted any false reports to YIG or to USDA, that she knew either that Anes was recording her work as seven hours a day or that YIG was submitting false claims to USDA. To the contrary, the only evidence which involved her would have justified an inference that she was hired by, and worked for, YIG and that she fulfilled the function set for by YIG, namely, the early morning inspection at the vendor's plant.

The Government put before the jury proof that Miss Horowitz was not seen by

---

**3.** Although this testimony came from defendants Puig and Anes, the Government did not offer contradictory testimony.

fellow employees at the 2167 Amsterdam office but her job did not require her to report to, or be seen at, that office. The fact that she was not seen there was quite irrelevant to the issue of whether she performed her assigned work in the early mornings at the vendor's plant. Although she did not take the stand she offered character witnesses. During their cross-examination the Government developed (and quite properly) a possible ultra-personal relationship between Miss Horowitz and an office superior to Buigues. Obviously this was intended not only to detract from Miss Horowitz' character but also to explain why a putative no-work job was being offered to her.

However, a careful reading of the transcript leads us to the firm conviction that Miss Horowitz' actions did not bring her within the scope of Counts One, Two and Three of the indictment, that the conviction as to her should be reversed and the indictment dismissed for want of adequate proof.

The Government pursued a commendable program of feeding lunches to underprivileged children but the Government does have a legitimate interest in seeing that its funds are not fraudulently dispersed. On this record, it is clear that a jury could infer that the defendants Buigues, Puig, Anes and Sammarco used the lunch program as a scheme to obtain federal funds for themselves. The scheme was epitomized by Anes' false entries and the payments thereon of which these defendants knew or may be presumed to have known. Proof of the necessary participation by Miss Horowitz is lacking. For these reasons, the judgment of conviction as to Buigues, Puig, Anes and Sammarco is affirmed; as to Miss Horowitz, the judgment is reversed and the indictment dismissed.